**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** 13-164- RLW |
| | : | |
| | : | |
| **v.** | : | |
| | : | **FILED** |
| **MICHAEL A. BROWN,** | : | **JUN 1 0 2013** |
| | : | Clerk, U.S. District & Bankruptcy |
| | : | Courts for the District of Columbia |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF THE OFFENSE AND OTHER CONDUCT

Had this case proceeded to trial, the government would have proved the following facts beyond a reasonable doubt:

### Relevant Individuals and Entities

1.      From in or about January 2009 through January 2, 2013, the defendant, MICHAEL A. BROWN ("BROWN"), was an elected at-large member of the Council of the District of Columbia ("D.C. Council"). As such, he was a public official within the meaning of Title 18, United States Code, § 201(a)(1). Among other official duties, BROWN provided constituent services, directed the activities of his Council and attendant Committee staff members, and communicated with agencies and departments concerning constituent and Council activities.

2.      As part of his official duties, defendant BROWN was the Chair of the D.C. Council's Committee on Economic Development and Housing, which was responsible for matters related to economic, industrial, and commercial development. Committee Employee A was the Committee Director of the Committee on Economic Development and Housing.

1

3.     The District of Columbia had a special program to help its small, disadvantaged, local businesses become economically viable: the certified business enterprise ("CBE") program. Status as a CBE conferred preferential procurement and contracting opportunities on such businesses. To be eligible, the businesses had to meet certain requirements and be certified by the District of Columbia's Department of Small and Local Business Development ("DSLBD"), a District of Columbia government agency. At all relevant times, DSLBD Employee A was the Director of the DSLBD.

4.     The Department of Consumer and Regulatory Affairs ("DCRA") was a District of Columbia government agency that, among other things, regulated the issuances of certificates of occupancy and home occupancy permits. One way for a business to establish its qualification as a local business under the CBE program was through the issuance of such a permit.

5.     Person A was an individual known to defendant BROWN.

6.     Company M was a Maryland company. Undercover Employee 1 ("UCE-1") and Undercover Employee 2 ("UCE-2") were undercover agents of the Federal Bureau of Investigation ("FBI") posing as employees of Company M.

**The Introduction of BROWN to Company M**

7.     Prior to July 11, 2012, defendant BROWN had discussions with Person A about whether Person A could assist BROWN to obtain $50,000-$75,000 for BROWN from any government contractors known to Person A. BROWN referred to this as a "loan." BROWN expected to assist the government contractor with its business if the contractor provided such financial assistance to BROWN.

8. On July 11, 2012, Person A, knowing that defendant BROWN wanted to secure $50,000-$75,000, arranged a meeting between defendant BROWN and UCE-1 who was interested in paying defendant BROWN the sum of $50,000 for assistance with a CBE application and government contracting opportunities.

### The First Cash Payment to BROWN from Company M

9. Later that day on July 11, 2012, defendant BROWN met Person A and UCE-1 at a restaurant, The Channel Inn, in the District of Columbia. UCE-1 was introduced to BROWN as an employee of Company M. UCE-1 described Company M to BROWN as a company interested in obtaining CBE approval and contracting opportunities in the District of Columbia. At the meeting, BROWN accepted $15,000 in cash from UCE-1 as part of a promised amount of $50,000 for BROWN's efforts to use his official position to assist Company M in becoming a CBE and obtaining contracting opportunities. The cash was in denominations of $100 bills and placed in a duffel bag with a Washington Nationals baseball hat and two Washington Nationals t-shirts.

10. While accepting the bag from UCE-1, defendant BROWN referred to the cash payment as a loan. UCE-1 told BROWN that he could keep the money. BROWN understood from his discussions with Person A and UCE-1 that, notwithstanding BROWN's reference to the payment as a loan, BROWN was not expected to repay the money. During subsequent discussions with UCE-1 and UCE-2, BROWN occasionally referred to the payments from Company M as a loan. Notwithstanding these discussions, no loan documents were ever drafted – and no loan terms were ever discussed – between BROWN and Company M.

3

11.    On July 12, 2012, defendant BROWN provided Person A with the name and telephone number of two staff members at the DSLBD to give to UCE-1 to serve as points of contact for Company M's CBE application.

### The Second Cash Payment to BROWN from Company M

12.    On the evening of August 2, 2012, UCE-1 and defendant BROWN met at the Four Seasons Hotel in the District of Columbia to discuss, among other things, Company M's CBE application and its contracting opportunities. BROWN and UCE-1 agreed to meet a few days later for UCE-1 to pay the $35,000 balance owed to BROWN. During the conversation, BROWN suggested that Company M could pay him an amount of money "north of" – meaning more than – the $35,000 balance that Company M owed to BROWN. BROWN did not quantify the amount of money "north of" the $35,000 balance that Company M could pay to BROWN.

13.    On August 7, 2012, defendant BROWN and UCE-1 met at a booth at The Channel Inn. During the meeting, BROWN accepted an additional cash payment of $10,000 from UCE-1 in exchange for BROWN continuing to assist Company M in obtaining approval of its CBE application and contracting opportunities. In handing the money over to BROWN, UCE-1 stated, "I got 10 for you, bro." UCE-1 handed BROWN $10,000 in cash in denominations of $100 bills. The cash was placed inside a Washington Redskins coffee mug. BROWN left the booth with the mug.

14.    After defendant BROWN and UCE-1 left the booth, BROWN told UCE-1 that BROWN would call the DSLBD after Company M submitted the necessary paperwork for its CBE application. When UCE-1 inquired about the anticipated timing for approval of Company M's CBE application, adding that UCE-1 could get BROWN "the other 25" upon approval,

BROWN responded, "Or north." BROWN further explained what he intended to say to the DSLBD: "[J]ust move a bunch of them to the top of the pile. Just don't single [Company M] out. Put [Company M] in a group of folks that have contracts waiting and then the scrutiny is fine. You just move the whole group that has contracts waiting. You are not just picking [Company M]."

15. On August 24, 2012, defendant BROWN and UCE-1 spoke by telephone. During the call, BROWN asked UCE-1 for an update on the status of Company M's CBE application. When UCE-1 told BROWN that he had not been able to obtain a certificate of occupancy for Company M, BROWN stated "that may even be a call I can make for you." UCE-1 identified for BROWN an employee at the DSLBD involved in Company M's CBE application. BROWN responded that he did not know the employee, but stated, "keep in mind, I know, whoever his boss is, that's who I know." During the call, BROWN raised "the other piece," referring to the money still owed by Company M to BROWN. BROWN asked UCE-1 to check with UCE-1's associates to "see if they can break off another small piece for me."

16. On August 27, 2012, defendant BROWN and UCE-1 spoke by telephone. During the call, UCE-1 told BROWN that UCE-1 had a meeting at the DSLBD scheduled for August 30, 2012, but that UCE-1 might have to attend the meeting at the DSLBD without a certificate of occupancy as part of Company M's CBE application. BROWN told UCE-1 that BROWN would call the DCRA to check on the status of Company M's certificate of occupancy. BROWN and UCE-1 agreed to meet the next afternoon for UCE-1 to make another payment to BROWN. Later, on August 27, 2012, BROWN called UCE-1 and stated that he had called the "head dude" at the DCRA to "see what's up."

5

**The Third Cash Payment to BROWN from Company M**

17.     On August 28, 2012, defendant BROWN and UCE-1 met at The Channel Inn. During the meeting, BROWN accepted an additional cash payment of $5,000 from UCE-1 in exchange for BROWN's assistance with Company M's CBE application and contracting opportunities.  Prior to paying BROWN the money, BROWN and UCE-1 discussed UCE-1's upcoming meeting at the DSLBD.  BROWN instructed UCE-1 to call BROWN after the meeting and inform him of any "next steps."  BROWN agreed to "double-back" to the DSLBD to tell the DSLBD to move Company M's application as quickly as possible.  Later during the meeting, UCE-1 stated to BROWN that UCE-1 was able to "put together five Gs," referencing an additional cash payment of $5,000.  UCE-1 placed on the table a silver coffee mug containing $5,000 in cash.  The cash was in denominations of $100 bills.  BROWN responded, "Definitely always very helpful."  BROWN left the restaurant with the mug.

**BROWN's Efforts to Help Company M at the DCRA**

18.     On August 30, 2012, defendant BROWN sent UCE-1 a text message that a staff member from BROWN's office at the D.C. Council had been trying to reach UCE-1.  BROWN's staff member also had left a voicemail for UCE-1 stating that the staff member had contacted the DCRA to inquire about the status of Company M's certificate of occupancy permit.

19.     On October 10, 2012, the DCRA approved Company M's application for a home occupancy permit.  Later that evening, UCE-1 sent a text message to defendant BROWN stating, "Hey thanks Mike.  I got the permit today.  I'll resubmit the [CBE] app tonight.  And should be back at [DSLBD] next week."  BROWN replied by text message, "Great!!  That's quick, I'm glad it worked out.  Congrats!"

20.     On October 11, 2012, BROWN and UCE-1 spoke by telephone.  During the call, UCE-1 informed BROWN that Company M included false information in its home occupancy permit application concerning UCE-1's residency in the District of Columbia, which was required for Company M's CBE application:

| | | |
|---|---|---|
| UCE-1: | | Hey I just wanted to catch up with you.  I haven't talked with you in a while, so. |
| BROWN: | | No no no.  I was just making sure everything uh is moving forward. |
| UCE-1: | | It is man.  I go um, um I don't know what you did man, but that app - that um that permit came through pretty quick. |
| BROWN: | | You're damn, damn right it came through quick. |
| UCE-1: | | {*Laughing*} So yeah.  I got that.  And I just submitted the uh, re-submitted the application.  So I think next week I should be able to get back up at the uh CBE spot.  And get this thing, get it moving. |
| BROWN: | | Great. |
| UCE-1: | | So I'm glad about that.  I had to just, I mean to get that permit, I had to create a damn lease and just sign it and so I can get it, you know.  It's saying that I lived in DC.  You know I live in Maryland, so - but I got it so we're moving now, so.  What's uh, what's your schedule like next week some time so we can try to get up and you know sit down and talk a little bit more? |
| BROWN: | | Oh no, absolutely.  Um, why don't you uh uh you always have to do some maneuvering before we meet, so. |
| UCE-1: | | I know.  I know. |
| BROWN: | | Why don't you, why don't you let me know on Monday what day works for you, after you've done your maneuvering.  And then I'll uh. |
| UCE-1: | | Okay. |
| BROWN: | | And then we'll figure it out.  And next week is fine. |

| UCE-1: | Okay, so maybe we can um like get um get something to eat or have a couple of drinks or something like that. |
|---|---|
| BROWN: | Oh no problem.  No problem. |
| UCE-1: | [*Unintelligible*] |
| BROWN: | Just do, do your maneuvering.  And even if you don't do the full maneuvering, do a piece.  And then you do the last piece at the uh, you know, when it's all done. |
| UCE-1: | Okay.  So I'll hit you up um, I'll hit you up Monday.  And then we'll get to sit down and we'll, we'll talk. |
| BROWN: | That's my man.  Okay. |

**BROWN's Initial Efforts to Help Company M at the DSLBD**

21.    On October 11, 2012, Company M submitted its CBE application to the DSLBD.

22.    On October 19, 2012, following a meeting at the DSLBD, UCE-1 sent a text message to defendant BROWN stating, "Hey Mike, might be running into an issue over here at the cbe office.  Can u give them a call?"  Within minutes, BROWN made an outgoing call to Committee Employee A.  During the call, BROWN told Committee Employee A the following: "There's a small company over at CBE, a DC company, they're giving him a little run around. Can you call over there and see what's up?"

23.    A short while later, defendant BROWN called UCE-1 and initiated a conference call between BROWN, UCE-1, and Committee Employee A.  After UCE-1 provided additional information to Committee Employee A, BROWN stated, "So, basically, we want to see if there is some kind of, I take it you want a waiver or something" relating to Company M's application for CBE certification.  As the call concluded, BROWN stated, "Alright, so [Committee Employee A]'ll call over there, then [UCE-1], we will get back to you and let you know what, if

we can try, if there is a waiver or something. I don't know what are in the rules relative to waivers for stuff like this, but [Committee Employee A] will find out."

24.     On October 22, 2012, UCE-1 sent a text message to defendant BROWN asking, "Hey Mike any news from the cbe office[?]" BROWN sent a text message to Committee Employee A asking, "Any update on that cbe issue[?]" In a subsequent call with UCE-1 on October 23, 2012, BROWN stated that Committee Employee A "called over there yesterday and so hopefully we'll get some kind of response on something in the next day or so, and then I'll be able to give you some guidance about what's up." During the call, BROWN also agreed to introduce UCE-1 to contractors, explaining the following: "Well, remember – keep in mind the CBE just gives folks the extra points. There is nothing that stops a company without CBE from being hooked up with somebody. Again, I can be helpful whether you're a CBE or not. It just makes it easier because it gives a benefit to the larger company that they get extra points."

### BROWN's Election Loss and Efforts to Obtain the "Last Piece" from Company M

25.     On November 6, 2012, defendant BROWN lost his bid for re-election as an at-large member of the D.C. Council. BROWN continued to serve as a member of the D.C. Council until his term expired on January 2, 2013.

26.     On November 9, 2012, UCE-1 sent defendant BROWN a text message stating, "Hey Mike. You think we can finish that thing we started?" BROWN responded, "Yes. On both fronts?" UCE-1 replied by referencing the money still owed to BROWN, which UCE-1 referred to as the "last piece," telling BROWN that "I got that last piece for u as soon as we finish."

27.     On November 11, 2012, BROWN sent a text message to UCE-1 stating that BROWN "need[ed]" a partial payment of the "last piece," which BROWN referred to as a "piece of the piece." UCE-1 replied, "If we can make that waiver happen this week you can have all of it. Maybe a little more."

28.     On November 13, 2012, defendant BROWN and UCE-1 had a telephone call to discuss a payment to BROWN, which BROWN had referred to as the "piece of the piece." In discussing an anticipated meeting between BROWN, UCE-1, and UCE-2, BROWN stated he would provide an update on the "waiver" for Company M to get it "over that hump." BROWN also stated that he would be working to get Company M in front of potential contract partners.

29.     On November 14, 2012, defendant BROWN and UCE-1 had a call to discuss plans for paying BROWN a "piece of the piece" during a meeting scheduled the next day between BROWN, UCE-1, and UCE-2. BROWN specifically inquired whether BROWN and UCE-1 would be "dealing with the piece of the piece" in front of UCE-2, or whether BROWN and UCE-1 would be "meeting separately on that." When told that they would be able to "deal with it" with UCE-2 present and that UCE-2 was "cool," BROWN responded, "Ok." UCE-1 inquired as to the amount of additional money that BROWN was requesting: "How much are you thinking? I gave you, last time we did it, I gave you five, are you thinking about the same? Or, how much are you thinking?" In response, BROWN stated, "Well, whatever you – I always want more so whatever you can do. So, whatever you can do is fine. . . . Whatever north of that is great."

30.     On the evening of November 15, 2012, defendant BROWN met with UCE-1 and UCE-2 at The Hamilton restaurant in the District of Columbia. During the meeting, BROWN

stated he was continuing to look into the "waiver" for Company M's CBE certification. In addressing the approach BROWN anticipated that the DSLBD would take to approve Company M's CBE application, BROWN stated, "I don't think they're going to do just one company out of the whole. You have to be in a group of companies . . . they're trying to figure out how many to put . . . in another wave that's about to come through. And then we can put you guys in that wave. Rather than just you by yourself because then there's less scrutiny." UCE-2 inquired whether BROWN could make an additional call on their behalf, possibly to DSLBD Employee A. BROWN responded, "That's what I'm doing. The problem is because of the new crackdown in the CBE process, it's made it difficult to move these companies in." Later in the conversation, BROWN stated, "I made the first call, again, to the big fella" – referring to DSLBD Employee A – "and then had my staff do a lot of the stuff to churn it through the system." When asked about the time-frame for approval, BROWN replied, "I have to get that from [DSLBD Employee A]. I can't stress enough – because he needs to obviously protect himself – it's a 12-18 month process and you all are at, what – month two or three? So you are way ahead of the curve."

31. The next day, November 16, 2012, UCE-1 sent a text message to defendant BROWN asking, "Were u able [to] make any headway today?" BROWN replied by text message: "Calls made. No updates yet." The following day, November 17, 2012, BROWN sent a text message to UCE-1 asking, "Do u have the piece of the piece?"

32. On November 19, 2012, defendant BROWN sent two identical text messages to UCE-1 asking, "Do u have the piece of the piece?" Later on November 19, 2012, BROWN and UCE-1 talked by telephone. During the conversation, BROWN stated "we're on it," concerning Company M's CBE application, but stated that many people and their staffs had left for the

11

Thanksgiving holiday. BROWN suggested that UCE-1 call the DSLBD to discuss a potential restructuring of Company M to address a potential deficiency in the application concerning the residency requirement and added, "I'll do what I'm supposed to do, but I think for you to keep your own dialogue stream open with them and ask that legitimate question, which is if we fix the structure, how long it takes, then you'll let me know what that is, and then I'll intervene if I have to." BROWN told UCE-1 that he had called DSLBD Employee A on Friday, November 16, 2012, but could not reach DSLBD Employee A. When UCE-1 clarified that BROWN had called DSLBD Employee A, referred to by UCE-1 as the "main guy" at the DSLBD, BROWN replied, "Yeah, yeah, yeah, I told, that's what I told you and [UCE-2] I would do." UCE-1 told BROWN that UCE-1 would contact UCE-2 to "see what we can do about sliding you some money." BROWN replied, "alright, man."

33.     On November 23, 2012, defendant BROWN and UCE-1 engaged in the following text message exchange in which UCE-1 informed BROWN that Company M had "restructured" its CBE application:

| UCE-1: | Mike, what time is that event on the 29th? |
|---|---|
| BROWN: | 10. I will be able to intro u 2 folks at that event. |
| UCE-1: | Ok good. I'm planning on a meeting with the cbe folks that afternoon. I restructured, so hopefully we're good. |
| BROWN: | Ok. Great. The piece? I can meet u on sat. |
| UCE-1: | I'm in jersey now. I'll be back Monday. Can u look out for me when I go to the cbe spot on Thursday? |
| BROWN: | I always look out 4 u. |

UCE-1:     I know. You do. I really need it Thursday so we can push this through. I did some crazy maneuvering to make it look like I reside in DC. It should work.

BROWN:     C u on Monday. I go 2 nyc Monday pm. So let's make it work.

34.     On November 26, 2012, defendant BROWN and UCE-2 spoke by telephone. During the call, BROWN expressed his intention to introduce UCE-1 and UCE-2 to DSLBD Employee A and contractors at a symposium to be hosted by BROWN on November 29, 2012. UCE-2 told BROWN that UCE-1 had "changed up the stuff" on Company M's CBE application "to obviously make it look like we're in D.C." UCE-2 asked BROWN if there would be "any additional scrutiny" based on Company M's changes to the CBE application. BROWN advised UCE-2 to follow the instructions provided by the DSLBD. BROWN agreed to speak with DSLBD Employee A to assist Company M through the CBE approval process. BROWN reiterated that "it is a 12-18 month process" to obtain a CBE and Company M was "at month three," which was "way, way ahead of where other people are who started at the same time." BROWN stated he intended to introduce UCE-1 and UCE-2 to contractors at the symposium, telling UCE-2 "not everybody is going to get introduced by me – so you don't have to worry about that, there won't be that kind of competition." BROWN also stated the following: "You're going to meet the Director. You'll probably end up meeting the Mayor. You'll probably end up meeting the Deputy Mayor for Economic Development. You're going to meet all the players. No one gets an opportunity to do that. Not everyone gets an opportunity to do that. You're getting that opportunity."

35.     When UCE-2 discussed the money already paid, defendant BROWN stated he was not "linking the two" and "one thing has nothing to do with the other," stating that he did

13

this for "people of color contractors all the time." UCE-2 advised BROWN, "I'm not a bank – whether it's a loan, whether you're paying me back, or whether I'm giving it to you – really to me, that's miniscule. But, the thing is – I loaned it, gave it, or whatever it is, in an effort to get some access." UCE-2 stated, "To me, it is linked together." When UCE-2 stated, "I want to get access," BROWN replied, "But you are – it's a 12-18 month process and you're way ahead of the game . . . way ahead. Very few people get the kind of access and get through the process as quickly as you guys have gotten. And I do that for other people. That's what I do. I try to increase, again, the opportunities for black folk." When asked about the "other people," BROWN stated, "Do I have friends that have helped me? Absolutely. But they did not link, they're not linking the two." BROWN also stated, "I'm still going to do everything I promised I would do for [UCE-1], to try to get him certified, to assist him in doing that, to introduce him to contractors so you guys can get some contracts," and reiterated that "one thing has nothing to do with the other."

**BROWN's Initial Call to DSLBD Employee A on Behalf of Company M**

36. On the morning of November 28, 2012, defendant BROWN had a telephone call with DSLBD Employee A regarding Company M. During the call, BROWN told DSLBD Employee A the following: "There are some – there is a young African American company – I don't mean young in age, I mean young as in, in how long they have been up and running. If you could give a couple of – they're going through the normal process with your office now to get their certification. But, they would love to kind of tell you a little bit of their story at some point today, if you have 15 minutes for them." BROWN also explained that UCE-1 and UCE-2 would be at the DSLBD the next day, "[b]ut with all the people walking around, they're not

14

going to really be able to kind of bend your ear the way they would like to, unless they were sitting in your office." DSLBD Employee A agreed to meet with UCE-1 and UCE-2, as requested by BROWN, and advised BROWN to have UCE-1 and UCE-2 call DSLBD Employee A's assistant to schedule the meeting "based off of your referral."

37.     Almost immediately following his call with DSLBD Employee A, defendant BROWN called Person A and provided the name and phone number of DSLBD Employee A's assistant. BROWN explained further, "And they need to call by – they might as well start calling now. Use my name, with [the assistant]. And they'll set it – they can have 20 minutes or 30 minutes today to tell them – they can go and tell them their story. To the Director, I just talked to him."

38.     Later that afternoon, UCE-1 called defendant BROWN to advise BROWN that UCE-1 had left two messages for DSLBD Employee A's assistant, but had not heard back from the assistant. BROWN stated, "Let me call him right now and let her know that, that meeting was supposed to happen today. So, I'll hit you right back." Approximately one minute later, BROWN made an outgoing call to DSLBD Employee A. During the call, BROWN advised DSLBD Employee A that UCE-1 had tried reaching DSLBD Employee A's assistant, but had not yet received a call back. DSLBD Employee A told BROWN that DSLBD Employee A would "walk back and touch base" with the assistant to follow-up on the issue. One minute after that, BROWN tried to call UCE-1. UCE-1, however, did not answer BROWN's call because DSLBD Employee A's assistant had called and was on the telephone with UCE-1.

39.     Later in the evening of November 28, 2012, UCE-1 received a call from DSLBD Employee A. During the call, DSLBD Employee A agreed to confirm Company M's upcoming

15

appointment at DSLBD.

### BROWN Facilitates Meeting Between DSLBD Employee A and Company M

40.     On November 29, 2012, UCE-1 and UCE-2 attended an economic development symposium, "Securing Access to Capital: An Economic Development Workshop for D.C.'s Small & Local Businesses," which was "Hosted by Councilmember Michael A. Brown, Chair, Committee on Economic Development & Housing." During the symposium, defendant BROWN facilitated a meeting between UCE-1, UCE-2, and DSLBD Employee A concerning Company M's CBE application. BROWN also introduced UCE-1 and UCE-2 to a local businessperson who, according to BROWN, facilitated financing for contractors.

### The Fourth Cash Payment to BROWN from Company M

41.     On the evening of November 29, 2012, defendant BROWN met UCE-1 at The Channel Inn. During the meeting, BROWN accepted an additional $5,000 in cash from UCE-1 as payment for BROWN's assistance with Company M's CBE application and contracting opportunities. The cash was in denominations of $100 bills and placed in an envelope. Prior to making the payment, UCE-1 stated to BROWN that he had "five," referring to $5,000 in cash that he was paying BROWN. BROWN responded, "The piece of the piece." BROWN left the restaurant with the envelope.

### BROWN's Continuing Efforts to Assist Company M

42.     On December 6, 2012, defendant BROWN and UCE-1 spoke by telephone. During the call, they discussed Company M's CBE application and BROWN's efforts to contact DSLBD Employee A. UCE-1 informed BROWN that UCE-1 had a meeting scheduled with the DSLBD the next day. BROWN told UCE-1 that DSLBD Employee A "knows why I'm calling,

16

so whether I get him or not, still go through with your meeting." BROWN advised UCE-1 to request an opportunity to meet with DSLBD Employee A during the meeting at the DSLBD and to mention to the DSLBD's staff members that UCE-1 had met DSLBD Employee A at BROWN's economic symposium on November 29, 2012. BROWN also expressed his intention to ask DSLBD Employee A to "stay on top" of Company M's CBE application.

43.     On December 11, 2012, defendant BROWN and UCE-1 engaged in two telephone calls. During the conversations, BROWN stated that he had "talked to the director" and "the story is that right now your stuff is being processed as we speak." BROWN added, "And if everything is in order, there's no reason it should take more than 20 days." BROWN stated that this was "very good" and that "hopefully they have everything they need and once they complete the process, hopefully we'll be moving and grooving." UCE-1 asked whether BROWN told DSLBD Employee A that "we had some contracts pending," and BROWN responded, "Exactly."

44.     On December 19, 2012, defendant BROWN sent UCE-1 a text message stating, "Need 2 get a piece 2day or thurs." UCE-1 replied, "I got that 20 for u . . . if we get that cert by fri." Later the same morning, BROWN called UCE-1 to reiterate his request to "at least get 5 from you," and stated that he was "continuing to try to move this ball forward for you as quickly as possible." BROWN stated that "our goal" of obtaining Company M's CBE approval before the holidays was "a stiff one, but it's our goal." UCE-1 explained it would be difficult to provide BROWN with a "piece of the piece," but stated that he would give BROWN "the whole 20," referring to the remaining $20,000 promised to BROWN by Company M, "once we get" the CBE certification. BROWN stated it would be a "tall order" to obtain the CBE approval "by

Tuesday," December 25, 2012, but that "we're working on it." BROWN again asked UCE-1 to "talk to [UCE-2] and see if at least you can get a piece of the piece today or tomorrow." BROWN later that day sent a text message to UCE-1 stating, "Hey fella, need 2 c u 2nite or very very early am 4 that piece."

### BROWN Continues to Advocate to DSLBD Employee A on Behalf of Company M

45. On the evening of December 19, 2012, defendant BROWN and Person A spoke by telephone. During the call, Person A explained to BROWN that BROWN would have "to do something for [UCE-2]" and, then, Person A could "get them to get you the money or meet you tomorrow and give you the money in the morning." Person A stated that if BROWN called DSLBD Employee A and asked DSLBD Employee A to call UCE-1 with a status update on Company M's CBE application or, alternatively, stated that DSLBD Employee A was assisting with obtaining a "temporary" CBE approval, Person A would be able to call UCE-2 and tell UCE-2, "Go ahead and give him some money tomorrow so he can go." BROWN agreed to contact DSLBD Employee A and stated, "Ok, I can try and track him down tonight, otherwise in the morning and I'll hit you tomorrow." At approximately 8:07 p.m. on December 19, 2012, BROWN sent a text message to DSLBD Employee A's cell phone stating, "Please call michael brown. Thanks."

46. On December 20, 2012, at approximately 9:18 a.m., defendant BROWN called DSLBD Employee A's cell phone, which was not answered and no voicemail was left. At approximately 9:20 a.m. that same morning, BROWN sent a text message to UCE-1 stating, "What time r we meeting 2day[?]" At approximately 9:26 a.m., BROWN sent a text message to Person A stating, "I need 2 meet [UCE-1] 2day." At approximately 9:57 a.m., BROWN and

18

Person A spoke by telephone. During the call, BROWN stated, "I need to catch up with [UCE-1]." When Person A inquired whether BROWN "g[o]t the phone call made for [UCE-2]," BROWN responded, "That's what I'm trying to get done today." Person A explained that if BROWN could "get that done," Person A would "get the money myself and bring it to you." Person A informed BROWN that UCE-2 "just needs some movement or something," because UCE-2 had "spent a lot of money." Person A told BROWN that if BROWN could "tell [DSLBD Employee A] to call [UCE-1] and say, 'Look man, I'm going to work on trying to get you your temporary certification so you can start bidding on some work,'" that would be sufficient for Person A to "go on and get you a piece of a piece."

47.     On December 20, 2012, at approximately 10:21 a.m., defendant BROWN called DSLBD Employee A's cell phone again, but the call was not answered. BROWN left a voicemail stating, "Mr. Director, Michael Brown . . . . Call me back when you can. Quick favor. Thanks."

48.     Later that same morning, defendant BROWN called one of his D.C. Council staff members. During the call, BROWN asked the staff member to have another staff member send him two telephone numbers, one of which was for DSLBD Employee A. Minutes later, BROWN received a text message from a staff member identifying DSLBD Employee A by his last name and providing the telephone number for the DSLBD. At approximately 10:38 a.m., BROWN called the number provided for DSLBD, learned DSLBD Employee A was not available, and left a message for DSLBD Employee A to call him back. At approximately 1:31 p.m., BROWN sent another text message to DSLBD Employee A's cell phone stating, "Call me, thanks." At approximately 2:40 p.m., BROWN again called DSLBD Employee A's cell phone,

19

but the call was not answered and no voicemail was left. At approximately 2:41 p.m., BROWN again called the number for the DSLBD, asked to speak to DSLBD Employee A, learned DSLBD Employee A was on a conference call, and left two telephone numbers for DSLBD Employee A to return the call.

49.     On December 20, 2012, at approximately 5:20 p.m., defendant BROWN and DSLBD Employee A spoke by telephone. DSLBD Employee A addressed BROWN as "Councilmember Brown." During the call, BROWN explained, "The reason I have been trying to push these guys along the uh, I think you met him at my access to capital thing, I think you may have talked to him a couple times – [UCE-1]." BROWN stated that UCE-1 and UCE-2 "supposedly have some contracts that they're ready to sign – teaming agreements with contractors and with um, um, some potential joint venture folks." BROWN continued, "Obviously, they don't want to lose the opportunity – and so that's why they're trying to get their stuff done as quickly as possible. I know you've been, um, you've been very helpful trying to make sure that they have all their paperwork – at least, your staff – making sure their paperwork is done and the like, um, and so I'm just trying to see if... do you guys still have the, um, temporary one that you give until people are actually certified, or is that gone?" DSLBD Employee A explained that the "provisional approval" process had been eliminated. BROWN inquired whether there had been "a lot of fraud in there I take it?" DSLBD Employee A responded, "Yeah, and generally because we would, if a contract was pending, we would work with a company to actually expedite the review and just approve it. You know, if it was on track to be approved we would . . . put it up in a line so to say." As the call continued, DSLBD Employee A told BROWN, "Let me do this, I can check in with the team to see, uh, to see where

it is . . . because I know they've, they've been in to meet and everything and I think they've submitted everything, but I can check with the team to see what the status is." BROWN replied, "That would be great," and asked DSLBD Employee A if someone from the DSLBD "wouldn't mind just calling and giving them that update so then they can tell their potential contractors at least where they are in the queue that would be great." BROWN provided DSLBD Employee A with UCE-1's name and telephone number, and stated that he would send a text message to DSLBD Employee A with Company M's name. BROWN reiterated his request to have someone from the DSLBD "call them tomorrow, or even this evening if they find out even though it's 5:00-5:30, but tomorrow that would be great."

50. Immediately after hanging up with DSLBD Employee A, defendant BROWN called UCE-1, but the call was not answered. Seconds later, BROWN sent two text messages to UCE-1 stating, "I have him on the phone 4 u. Call me asap. Just called u." At approximately 5:28 p.m., BROWN sent another text message to UCE-1 stating, "Name of company and your complete name asap." At approximately 5:30 p.m., UCE-1 replied back to BROWN with a text message identifying Company M's name and address. Approximately a minute later, BROWN called DSLBD Employee A's cell phone, but the call was not answered. Approximately a minute later, BROWN sent a text message to DSLBD Employee A identifying Company M's name and street address.

51. On December 20, 2012, at approximately 6:15 p.m., defendant BROWN called Person A. During the call, BROWN stated he previously had DSLBD Employee A on the phone for UCE-1 and BROWN had called and texted UCE-1 to call him right back, but UCE-1 had not done so. BROWN stated further, "I got the information that, you know, we need, but I wanted

21

him to hear – you know their whole thing was they wanted to hear it from him – not only did I call him, I also text him and said I have him on the phone holding." BROWN also stated, "Well see, but I don't want to hear it on the other thing. So, I need to see [UCE-1] tonight or tomorrow on the other piece because I did my part." BROWN explained to Person A that UCE-1 "is in the expedite pile so they are moving him as quickly through the process."

52. On the evening of December 20, 2012, and the morning of December 21, 2012, defendant BROWN sent text messages to UCE-1 inquiring about a time for a meeting. When UCE-1 asked BROWN whether there had been "[a]ny confirmation on the cbe," BROWN responded, "I had him on the phone 4 u yesterday. Things r moving. When am I seeing u 2day[?]"

53. On December 21, 2012, defendant BROWN and UCE-1 spoke by telephone. During the call, BROWN stated that when he had DSLBD Employee A on the phone that BROWN had intended to initiate a "three-way" communication between BROWN, DSLBD Employee A, and UCE-1 because DSLBD Employee A "wanted to talk." When asked about Company M's status in the approval process, BROWN stated that DSLBD Employee A was "moving it," and added the following: "I wanted him to tell you directly. He's moving it as quickly as he can. His team is working on it. I told him you all had some contracts, that you had – not contracts – but some teaming agreements and joint ventures ready to sign and you couldn't do it until you got that." BROWN added that DSLBD Employee A was "trying to move it quickly for me and he wanted to kind of tell you that." BROWN stated that DSLBD Employee A was doing "a whole lot for me on this." In response, UCE-1 told BROWN that "the bargain, you know, is we get the paperwork and you just push it along, so we need a little more

confirmation if it's approved." BROWN stated that DSLBD Employee A was "expediting" Company M's CBE application, Company M was "way ahead of the curve" and "at the top of the pile" in terms of approval, and DSLBD Employee A "has been bending over backwards for me." BROWN asked to meet with UCE-1 later that day or the next day for "a piece of the piece."

54. In a subsequent call between defendant BROWN and Person A on December 21, 2012, Person A explained that he had spoken with UCE-2, who wanted to see something additional for the "35 grand on the table," referring to the previous $35,000 that already had been paid to BROWN. In response, BROWN stated, "That's what I had worked out yesterday. I had it, I had the dude – you know, I mean, these are important people, and there is certainly a way they can equate, but when people hire lobbyists to do stuff – you know, this shit ain't – no, it's not cheap to get people on top of the pile. I can't – you know, shit that's not my fault that's how the process works. The process is what it is, but they are way ahead of the curve. Way ahead! I mean, you probably could count on one hand how many applicants get to talk to the Director – and meet the Director." BROWN explained further, "I told him just a piece – just another piece of a piece. I understand that they need to continue to parcel it out."

### BROWN's Continuing Efforts to Obtain a "Piece of the Piece" from Company M

55. In additional text messages between defendant BROWN and UCE-1 between December 21, 2012, and January 2, 2013, BROWN attempted to schedule a meeting to receive an additional payment, which BROWN continued to refer to as "the piece of the piece." BROWN offered to travel to Maryland to meet UCE-1 for the payment and, upon learning that UCE-1 was out of town, suggested that UCE-1 "go 2 a bank and wire it." In response, UCE-1

asked BROWN for "some affirmation from [DSLBD Employee A] or even one of his workers that this thing is going through." BROWN replied, "I tried 2 do that the other day with him on the phone." On January 2, 2013, BROWN's last day in office as a D.C. Councilmember, UCE-1 asked via text message whether BROWN had received an update from the DSLBD. BROWN responded, "Working on it. Need 2 c u."

56. On January 4, 2013, defendant BROWN sent a text message to UCE-1 asking, "What time r we meeting 4 the piece of the piece[?]" Later that afternoon, BROWN called DSLBD Employee A's cell phone, but the call was not answered and BROWN did not leave a voicemail. Within minutes following that attempted call, BROWN sent two text messages to UCE-1 stating, "What time r we meeting 4 the piece of the piece[?] Call me. I have a[n] update." During a subsequent telephone conversation with UCE-1 on January 4, 2013, BROWN stated that he and DSLBD Employee A "missed each other today." BROWN stated that he had spoken with "one of [DSLBD Employee A's] folks" and that Company M's CBE application was "being expedited and kind of moving through the process pretty quickly." UCE-1 advised BROWN that the DSLBD had scheduled a site visit for Company M for Monday, January 7, 2013. In response, BROWN stated, "Oh good, that must have been from he and I missing each other 'cause he probably knew I was calling to check on your progress." During the call, BROWN instructed UCE-1, "you need to tell [UCE-2] I need a piece of a piece, man." BROWN stated he had called DSLBD Employee A "more than anybody else I've ever called for. I mean, I'm not going to be able call him on anybody else, ever in life." BROWN stated that he had been "moving you all through, trying to get you all through like I do for other folks," and added, "But I'm using all the capital up just for you guys." BROWN again reiterated his request for a "piece

24

of a piece" and stated further, "I mean, again, one thing has nothing to do with the other, but a piece for a piece would be great."

57. On January 7, 2013, the DSLBD conducted a site visit as part of Company M's CBE application.

58. On January 9, 2013, defendant BROWN and UCE-1 spoke by telephone. During the call, UCE-1 told BROWN that the site visit had occurred on January 7, 2013.

59. On January 16, 2013, defendant BROWN and UCE-1 spoke by telephone. During the call, BROWN reiterated his request for "a piece of the piece" and stated, "You guys have had major movement now. You got the [site] visit, you're meeting contractors." UCE-1 told BROWN that UCE-1 and UCE-2 would pay BROWN the "whole thing at one time" once Company M's CBE application was approved.

60. On January 29, 2013, defendant BROWN and Person A spoke by telephone. During the call, BROWN stated that Company M's CBE application "should be close, but I can't spend any more political capital. They're not really doing anything to help me do that."

**BROWN's Request for the Final Payment from Company M**

61. On March 9, 2013, defendant BROWN and Person A spoke by telephone. During the call, Person A told BROWN that BROWN's "political muscle must have paid off because [UCE-1] was happy as shit." Person A asked BROWN, "does [UCE-1] still owe you anything?" BROWN replied, "yes . . . . the answer is yes." Person A asked BROWN how much money UCE-1 still owed BROWN. BROWN said "the remainder, like 20."

62. Later that day on March 9, 2013, defendant BROWN sent a text message to UCE-1 stating, "Call me." Later the same day, BROWN sent another text message to UCE-1 stating,

"Call me." UCE-1 replied by text message that UCE-1 was out of town and could meet with BROWN on March 13 or 14, 2013.

63. On March 10, 2013, defendant BROWN sent a text message to UCE-1 stating, "Can u or [UCE-2] have it delivered or sent on monday," *i.e.*, March 11, 2013. UCE-1 replied the same day, "That dude hates to wire money. He'll be in DC Thursday for a presentation we have for the business. I'll talk to him about bringing a piece." BROWN replied less than two hours later, "??"

64. Later that evening on March 10, 2013, defendant BROWN and UCE-1 spoke by telephone. During the call, BROWN stated that he "heard you all got some good news." UCE-1 told BROWN that UCE-1 had talked to DSLDB and "we are in good shape now." BROWN asked, "So piece of the piece or the whole piece?" UCE-1 stated that he would talk to UCE-2 and they "might be able to do the whole piece because, I mean, I think we are that good." UCE-1 stated that UCE-2 would be in the District of Columbia on March 14, 2013. The following conversation ensued:

| | |
|---|---|
| BROWN: | Sounds like the whole thing, doesn't it? |
| UCE-1: | Yeah, it sounds like the whole thing. So I'll talk – |
| BROWN: | Right. |
| UCE-1: | We can do the whole thing. Is it – |
| BROWN: | Alright. |
| UCE-1: | We were talking what, 15? |
| BROWN: | Um, pardon me? |
| UCE-1: | It was 15 left? |

26

| BROWN: | It was 20 left. |
|---|---|
| UCE-1: | 20 left, okay. Alright, yeah, I'll talk to him. I don't think it's going to be an issue cause – |
| BROWN: | Okay. |
| UCE-1: | Based on the conversation. So, will you be able to meet Thursday? |
| BROWN: | Yeah, yeah you text me when and where and, and we'll figure it out. |
| . . . . | |
| UCE-1: | Cause we're ready now. So – |
| BROWN: | I bet. And you all got it at warp speed. |
| UCE-1: | Good. Good. That's good. I guess your calls and, uh, helped out. |
| BROWN: | Usually there's a 14, 14 month process. |

UCE-1 and BROWN agreed to meet on March 14, 2013.

### **The Fifth and Final Cash Payment to BROWN from Company M**

65.     On March 14, 2013, defendant BROWN met UCE-1 and UCE-2 at a conference room in the Marriott Wardman Park hotel in Washington, D.C. During the meeting, BROWN accepted an additional payment of $15,000 in cash from UCE-2 as fulfillment of Company M's promise to pay $50,000 to BROWN for assistance in obtaining CBE approval and government contracting opportunities. UCE-2 told BROWN that UCE-2 "appreciated" BROWN's assistance, including the calls and introduction to DSLBD Employee A, and explained further to BROWN, "You did your piece." The cash was in denominations of $100 bills and wrapped with a rubber band.

66.     During the meeting, UCE-2 also paid BROWN a "bonus" of $5,000 cash for

27

BROWN's past official acts on behalf of Company M and future influence if BROWN were re-elected to public office. UCE-2 told BROWN, "I'm going to give you another 5 – and that's because you did it." UCE-2 explained further that BROWN would be paid a "little something extra" because "you did do what you were supposed to do." During the conversation, UCE-2 also discussed "doing more things together" if BROWN were re-elected to public office in the future, and explained further, "I see what you can do, and I'd love to keep you in my corner." The $5000 cash was in denominations of $100 bills and wrapped with a rubber band. As a result, the total amount paid to BROWN by Company M was $55,000.

67.     During the meeting, BROWN placed the two cash payments ($15,000 and $5,000) in his lap. At the end of the meeting, law enforcement agents entered the room and announced their presence. As the agents were entering the room, BROWN placed the $20,000 in cash on the table in front of him.

68.     Company M subsequently withdrew its CBE application from the DSLBD's consideration.

## STATEMENT OF OTHER CONDUCT

69.     Eugenia C. Harris ("Harris"), a resident of the District of Columbia, owned and controlled Details International, Inc. ("Details International"), a for-profit corporation registered in the District of Columbia.

70.     Co-Conspirator 1 was the sole owner of Company A and the majority owner of Company B, both of which were District of Columbia for-profit corporations. Defendant BROWN knew Co-Conspirator 1 through family connections and mutual friends.

71.     The District of Columbia Campaign Finance Reform and Conflict of Interest Act

28

of 1974, as amended, D.C. Code §§ 1-1101.01 through 1-1151.06 (the "D.C. Campaign Finance Reform Act"), regulated financial activity intended to influence the election of candidates for public office in the District of Columbia. The D.C. Campaign Finance Reform Act established limits on the amounts that individuals could contribute to an individual candidate's political campaign committees and also prohibited making a political contribution in the name of another person.

72.     In the Spring of 2007, defendant BROWN was an announced candidate in a special election for the Ward 4 seat on the D.C. Council. In or around that time, BROWN met with Co-Conspirator 1 at Co-Conspirator 1's office in the District of Columbia. The purpose of the meeting was for BROWN to seek a contribution from Co-Conspirator 1 to BROWN's political campaign committee for the Ward 4 seat. BROWN understood from his discussion with Co-Conspirator 1 during that meeting, and from similar discussions with Co-Conspirator 1 during BROWN's candidacy for Mayor in 2005-06, that Co-Conspirator 1 would not contribute to BROWN's political campaign committee in a public manner because certain business activities of Company A and Company B required Co-Conspirator 1 to publicly support different candidates based on the contemporaneous political dynamics. During the meeting, Co-Conspirator 1 agreed to contribute to BROWN's political campaign committee for the Ward 4 seat, but not in a public manner. Instead, BROWN understood from the meeting that Co-Conspirator 1's contribution to BROWN's political campaign committee would be publicly disclosed as having been contributed in the name of another person. BROWN also understood from his discussion with Co-Conspirator 1 that Co-Conspirator 1's contribution to BROWN's political campaign committee would exceed the limits on the amount that an individual could

contribute to a political campaign committee. At the end of the meeting, Co-Conspirator 1 told BROWN that BROWN would hear from somebody to arrange Co-Conspirator 1's contribution to BROWN's political campaign committee.

73. Following his meeting with Co-Conspirator 1, defendant BROWN was contacted by Harris on behalf of Co-Conspirator 1. BROWN and Harris discussed an arrangement whereby Co-Conspirator 1 would contribute to BROWN's political campaign committee, but not in the name of Co-Conspirator 1. As part of the arrangement, BROWN understood that the money to be contributed to BROWN's political campaign committee by Co-Conspirator 1 would exceed the limits on the amounts that individuals could contribute to BROWN's political campaign committee. Because Co-Conspirator 1 did not want Co-Conspirator 1's name publicly associated with the contribution, and because the amount of Co-Conspirator 1's contribution would exceed the limits on individual contributions, BROWN agreed as part of the arrangement to mask the contribution from Co-Conspirator 1 as a campaign contribution directly from BROWN to his own political campaign committee. Unlike limits on individual contributions, the D.C. Campaign Finance Reform Act did not limit the amount that a candidate could contribute to his or her own political campaign committee, provided the candidate publicly disclosed the contribution.

74. As agreed between BROWN, Harris, and Co-Conspirator 1, Co-Conspirator 1 would provide money to Harris, who would then provide the money to BROWN. On or about April 26, 2007, and May 3, 2007, Harris sent two wire transfers of $10,000 to defendant BROWN's personal account. BROWN understood that the $20,000 from Harris originated from Co-Conspirator 1. BROWN, in turn, contributed the funds to his political campaign committee.

75.     Defendant BROWN subsequently caused his political campaign committee to file a form with the District of Columbia's Office of Campaign Finance (OCF Form 16) publicly disclosing that BROWN made an individual contribution of $25,000 to his political campaign committee on April 30, 2007, which BROWN knew disguised the fact that Co-Conspirator 1 was the source of a $20,000 contribution to BROWN's political campaign committee.

76.     As part of the arrangement with Co-Conspirator 1 and Harris, BROWN signed a document that described the payments from Details International to BROWN as a loan. BROWN understood that the document was a pretext intended to provide a legitimate, albeit misleading, basis for the payments from Details International to BROWN. BROWN understood from his discussions with Co-Conspirator 1 and Harris that, notwithstanding the document describing the payment as a loan, BROWN was not expected – and BROWN did not intend – to repay the money. Neither Co-Conspirator 1 nor Harris ever sought repayment of the money.

MICHAEL K. ATKINSON
DAVID A. LAST
ANTHONY D. SALER
Assistant United States Attorneys
555 4th Street, N.W., 5th Floor
Washington, D.C.  20530

## Defendant's Acceptance

I have read this Statement of the Offense and carefully reviewed every part of it with my attorneys. I am fully satisfied with the legal services provided by my attorneys in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

_June 20, 2013_
Date

_____
MICHAEL A. BROWN


## Defense Counsel's Acknowledgment

We are Michael A. Brown's attorneys. We have reviewed every part of this Statement of the Offense with him. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

_6 - 10 - 13_
Date

_____
REID H. WEINGARTEN
BRIAN M. HEBERLIG
SCOTT ARMSTRONG